In re GORDON CAR AND TRUCK RENTAL, INC., Debtor.

GORDON CAR AND TRUCK RENTAL, INC., Plaintiff,

v.

AMERICAN MOTORS LEASING CORPORATION, AMC Leasing Corporation and Bank of Utica, Defendants.

Bankruptcy No. 85–00709.
Adv. No. 86–0104.

United States Bankruptcy Court, N.D. New York.

June 15, 1987.

Brett W. Martin, Utica, N.Y., for debtor.

Menter, Rudin & Trivelpiece, P.C., Albany, N.Y., for American Motors Leasing Corp. and AMC Leasing Corp.; Jonathan D. Deily, of counsel.

Penberthy, Kelly & Walthall, P.C., Utica, N.Y., for Bank of Utica; William W. Kelly, of counsel.

MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

On August 18, 1986, Gordon Car and Truck Rental, Inc. ("Debtor") commenced this adversary proceeding against American Motors Leasing Corporation and AMC Leasing Corporation (collectively "AMC"). The action sought a declaration of AMC's security interest, if any, in certain automobile and truck franchise/license agreements ("licenses") entered into between the

Debtor and Avis-Rent-A-Car System, Inc. ("Avis"). By Order dated October 29, 1986, the Bank of Utica ("Bank") was permitted to intervene as a party defendant, as it also claimed a security interest in the licenses. The Bank subsequently moved for summary judgment, and AMC moved to dismiss each of Debtor's causes of action, and the Bank's cross-claims. The parties have stipulated to having the Court render final determination on the merits of all outstanding claims to the licenses.

## FINDINGS OF FACT

The Debtor was at one time the Avis franchisee for the cities of Binghamton, Corning, Elmira, Ithaca, and Utica, New York. The Debtor had operated the business pursuant to the licenses with Avis since at least 1956.[1]

At some point, the Debtor began leasing the motor vehicles used in its business from AMC, and entered into at least four separate "Master Fleet Vehicle Lease Agreements" ("Master Fleet Agreements") with that party.[2] Sometime in March, 1984, the Debtor executed an "Addendum" to each existing Master Fleet Agreement which read:

> As further security for the performance of this lease, Lessee [Debtor] hereby grants, assigns and conveys to Lessor [AMC] a continuing security interest in any and all proceeds, accounts and general intangibles (as defined in the Uniform Commercial Code) now existing or hereafter arising as a result of the rental, lease or use by [Debtor] of any or all of the vehicles leased hereunder.

AMC had drafted and prepared the Addendum. By letter dated March 12, 1984, Debtor forwarded to AMC the executed Addendum, together with executed financing statements (UCC–1). The financing statements were presumably filed with the offices of the Clerk of Oneida County, New York, and the New York Secretary of State.[3]

On July 22, 1985, AMC commenced suit against Debtor in the New York Supreme Court, Oneida County, seeking money damages in the amount of $565,466.63 due to Debtor's alleged breach of the Master Fleet Agreements.[4] Also on that date, the Honorable Edward S. Conway, Justice of the New York Supreme Court at Albany, New York, entered an order to show cause and temporary restraining notice in AMC's favor against Debtor. This order required Debtor and other individuals to show cause why an order should not be entered directing seizure of vehicles, proceeds, accounts, and general intangibles, pursuant to § 7102 of New York's Civil Practice Law and Rules (McKinney 1980) ("CPLR"). This order specifically restrained Debtor from in any way alienating or encumbering its interest in "any franchise, operating agreement, or lease and the proceeds thereof".

On the original return date of July 31, 1985, Justice Donald H. Miller of the New York Supreme Court entered a conditional seizure order on AMC's behalf. The order was to be effective five days hence in order to allow the parties room to negotiate. On August 7, 1985 the parties returned before Justice Miller, who amended the earlier seizure order to make it effective August 9, 1985 at 3:30 p.m.

By August 15, 1985, AMC had yet to exercise its rights under the seizure order, and Debtor's Board of Directors held a meeting to consider the corporation's future. An AMC representative attended the meeting, and raised the claim of a security interest in the licenses. Debtor's counsel

---

1. Debtor began operations in Utica under Avis license in 1956, and in Binghamton in 1960. In 1965, operations in Elmira and Ithaca commenced. The Corning branch business started in 1969.

2. Dated on or about January 8, 1980, January 9, 1981, March 16, 1982, and July 1982.

3. The quality of the photocopies of these documents provided the Court make it impossible to determine the place of filing. Further, these financing statements indicate they cover property described as "See Attached", without reference to an additional document. The Court can only presume that a copy of the Addendum was also filed with each document.

4. AMC amended its verified complaint on August 7, 1985, and served Debtor's counsel the same date.

avers this was the first time AMC ever sought to include the licenses within the collateral identified in the Addendum. For reasons unknown, AMC's representative was given possession of the original licenses for "safekeeping". Presumably, the transfer was made with the understanding that Debtor reserved its rights to dispute AMC's security interest in the licenses.

On August 27, 1985, the Debtor executed and mailed to AMC a verified answer to AMC's amended complaint. However, it is possible that AMC had already entered a default judgment against the Debtor on August 26, 1985.[5] On August 28, 1985 the Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 ("Code").

By Memorandum-Decision dated January 16, 1986, the Court ordered AMC to return the original license agreements to the Debtor, as the documents were property of the bankruptcy estate. The licenses were then subsequently assigned to Robert Castle at the close of an auction sale on October 8, 1986, and the sale proceeds placed in escrow.

The Bank's claimed security interest in the licenses allegedly arises as a result of a security agreement with Debtor dated September 15, 1977. Pursuant to this security agreement, the Bank was granted security interests in

All motor vehicles, equipment, machinery, furniture, fixtures, tools, and inventory now owned or hereafter acquired. All accounts receivable now owned or hereafter created.

The Bank perfected its security interest by filing financing statements with the New York Department of State on October 11, 1977 (continued August 19, 1982), and with the Clerk of Oneida County, New York on October 12, 1977 (continued August 2, 1982).

## CONCLUSIONS OF LAW

1. The Bank did not have a security interest in the licenses, or the sale proceeds thereof.

2. AMC did not have a security interest in the licenses, or the sale proceeds thereof.

3. The Bank is not entitled to an administrative priority or super priority claim against the Debtor's estate at this juncture.

## I. NATURE OF THE COLLATERAL

As between AMC and the Bank, the crux of this decision turns upon the definition to be given the licenses for the purpose of collateral status under the New York version of the Uniform Commercial Code, N.Y. U.C.C. §§ 1–101 to 13–105 (McKinney 1964 & Supp.1987) ("N.Y.U.C.C."). The Bank contends the licenses are "accounts", while AMC argues the documents are "general intangibles".

N.Y.U.C.C. § 9–106 provides the following pertinent definitions:

"Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance. "General intangibles" means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money. All rights to payment earned or unearned under a charter or other contract involving the use or hire of vessel and all rights incident to the charter or contract are accounts.

This section had been revised by legislative amendment in 1977. L.1977, c. 866, § 10. The legislature's action reflected a

5. Attached as Exhibit J to the affidavit of Debtor's counsel dated December 9, 1986, is a photocopy of a letter from AMC's attorneys stating that a judgment had been docketed against Debtor in the state court proceedings on August 26, 1985. Also attached is a photocopy of a statement for judgment and a notice of entry which is not signed by a clerk of the New York Supreme Court, nor does it contain a stamp indicating that it was filed in the office of the appropriate clerk. Whether a default judgment was entered or not, AMC has at all times during the course of these proceedings referenced its claim to a security interest in the licenses upon the order of seizure which allegedly contains a finding of fact that AMC was secured in all proceeds, accounts and general intangibles ... existing as of March 12, 1984 or thereafter acquired by the Debtor, without reference to the Master Fleet Agreements.

change which had been made in the Official Text of the Uniform Commercial Code ("U.C.C.") in 1972. As the "Draftmen's Statement of Reasons for 1972 Changes in Official Text", U.C.C. § 9–106 (1972) makes clear:

> The term "contract right" has been eliminated as unnecessary. As indicated by a sentence now being eliminated from Section 9–306(1), "contract right" was thought of as an "account" before the right to payment became unconditional by performance by the creditor. But the distinction between "account" and "contract right" was not used in the Article except in subsection (2) to Section 9–318 on the right of original parties to modify an assigned contract, and that subsection has been re-drafted to preserve the distinction without needing the term "contract right". The term has been troublesome in creating a "proceeds" problem where a contract right becomes an "account" by performance; in the Code's former denial that there could be any right in an account until it came into existence (former Section 9–204(a)(d), not withstanding a security interest in the pre-existing contract right; and in the danger of inadequate description in financing statements by claiming "accounts" or "general intangibles" when before performance they should have been described as "contract rights"; and in other respects.
>
> "Money" is expressly excluded from the catch-all definition, "general intangible", to preclude any possible reading that a security interest in money may be perfected by filing.

The Bank has confused the licenses with other contracts which are for the sale or lease of goods, or the rendition of services. The 1977 amendments to the N.Y.U.C.C. were not designed to erase the distinction between the discrete collateral species of "accounts" and "general intangibles". Rather, the legislature sought to eradicate the obscure distinction made between certain rights stemming from contracts for the sale or lease of goods or rendition of services, and the monies generated therefrom. As the Draftmen's Comment, *supra*, notes, secured parties desiring an interest in all rights arising from such an agreement often found themselves at a loss because certain of those rights (heretofore designated as "contract rights") had not matured to the form of right defined as an "account". This distinction was previously recognized in New York:

> An "account" under the Code is the next thing to money in the till, .... A "contract right" is also concerned only with money payments and is one degree less definite: the contract exists but since the goods are not delivered or the services are not yet rendered, the money is not yet due and it is not an "account." The value of the contract right may be diminished by the prospects of non-fulfillment of the conditions, but it is nonetheless a species of property which may now be assigned. *Cooper v. Douglass*, 44 Barb. 409 (1864); *Seamon v. Federated Films, Inc.*, 142 N.Y.S.2d 324 (1955); Cf. *Rockmore v. Lehman*, 129 F.2d 802 (2d Cir. 1942). "General intangibles" is a term by which the Code leaves room for expansion of recognition of commercially significant assets as assignable property.

N.Y.U.C.C. § 9–106, New York Annotations.

In sum, an "account" was (and is) a right earned by performance under an agreement for goods sold or leased, or services rendered.

In any event, the licenses did not give Debtor a "right to payment for goods sold or leased or for services rendered". The cases cited by the Bank are simply not germane to the fundamental point that the licenses, although themselves written contracts, are not "contract rights" as were formerly defined by the N.Y.U.C.C.

Indeed, the very source cited by the Bank recognizes the distinction. Hawkland, 8 UNIFORM COMMERCIAL CODE SERIES, § 9–102:02, 211–13.[6] If the

---

**6.** "Under the 1972 Code, the definition of accounts is sufficiently broad to include within it contract rights, *so long as they relate to the sale or lease of goods or the rendering of services.*

Bank's contention were accepted, it would necessarily follow under the present N.Y. U.C.C. that the licenses are themselves "accounts". Such an interpretation flies in the face of general commercial practice, and as shall be seen, with those authorities which have drafted, commented upon, and interpreted U.C.C. § 9–106.

The Draftmen's Comment to the 1972 version of the U.C.C. supplements the statutory definition of "general intangibles" by stating the term:

> ... brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security. Examples are good will, literary rights, and rights to performance. Other examples are copyrights, trademarks and patents ...

*See also* N.Y.U.C.C. § 9–106, New York Annotations.

By definition, "general intangibles" are items of personal property which are not "accounts" (or for that matter, "contract rights").

■ The licenses are "general intangibles", granting as they do contractual rights not involving the sale or lease of goods, or the rendering of services. Thus, it has been held that the franchise agreements for the operation of certain automobile dealerships constitute "general intangibles". *Hengalo Enterprises, Inc. v. Sun Bank of Miami, Inc. (In re Hengalo Enterprises, Inc.)*, 51 B.R. 54 (Bankr.S.D.Fla. 1985). In a similar context, liquor licenses, as property under U.C.C. § 9–102, have been held to be "general intangibles" for purposes of U.C.C. § 9–106. *See e.g. Bogus v. American Nat. Bank of Cheyenne*, 401 F.2d 458 (10th Cir.1968); *Paramount Finance Co. v. United States*, 379 F.2d 543, 544–45 (6th Cir.1967); *Gibson v. Alaska Alcoholic Beverage Control Board*, 377 F.Supp. 151, 153 (D.Alaska 1974). The relatively rare clam dredging license has also been classified in this collateral category.

*First Pennsylvania Bank, N.A. v. Wildwood Clam Co.*, 535 F.Supp. 266, 268 (E.D. Pa.1982).

The cases cited by Bank support rather than detract from the proposition that the Avis licenses are general intangibles. In the case of *Crichton v. Himlie Properties, Inc. (In re Himlie Properties, Inc.)*, 36 B.R. 32 (Bankr.W.D.Wash.1983), the court held that debtor's contracts (denoted as "Seller's Assignment of Contract & Deed"), executed in behalf of various creditors were "general intangibles", rather than "contract rights" or "accounts". The bankruptcy court noted that "the vendor's (assignor's) right to payment did not depend upon any future performance. The only duty assumed by the assignee was to deliver title to the vendee at the time of final payment. Clearly, this formality is not the type of future performance contemplated by the U.C.C. [as a 'contract right']." *Id.*, 36 B.R. at 35. The bankruptcy court had previously indicated that as the subject contracts did not involve the sale or lease of goods or the rendition of services, the collateral could not be classified as "accounts". *Id.*, 36 B.R. at 34.

Similarly, the case of *Burger King Corp. v. Rovine Corp. (In re Rovine Corp.)*, 6 B.R. 661 (Bankr.W.D.Tenn.1980) is inopposite as the primary concern was whether the plaintiff could enforce a covenant not to compete contained in a franchise agreement which the Debtor had rejected as an executory contract pursuant to Code § 365(d). The plaintiff argued that the franchise agreement was not, for bankruptcy purposes, an executory contract, but rather was a license.

The bankruptcy court agreed that franchises and licenses bore marked similarities, but noted that the former evidenced a continuing undertaking between the contracting parties "to cooperate in the operation of the franchised business and to insure that the license or franchise will not be infringed upon by third parties." *Id.*, 6

---

... Where the receivable arises other than from the sale or lease of goods or rendering of services, or the contract that will give rise to the receivable is other than for the sale or lease of

goods or the rendering of services, *the resulting right to payment is not an account, but is a general intangible."* (emphasis added).

B.R. at 666. But again, the seminal point is that such an agreement is clearly not considered the norm for the sale or lease of goods or the provision of services as contemplated by the U.C.C.

The licenses herein were general intangibles as defined by the N.Y.U.C.C. Thus, while a creditor may utilize the general categories of collateral to describe the property in which it desires an interest, any improper or imprecise characterization will defeat a claimed security interest. This is so as the security agreement of the parties must be reasonably specific in identifying the collateral subject to the security interest. *Commercial Trading Co., Inc. vs. Bassin (Matter of Laminated Veneers Co., Inc.)*, 471 F.2d 1124, 1125 (2d Cir.1973); *Lettinga v. Agristror Credit Corp.*, 686 F.2d 442, 448 (6th Cir.1982); *cf. Gulf National Bank v. Franke (Matter of Katz)*, 563 F.2d 766 (5th Cir.1977) (per curiam) (imprecise description used in financing statement). Consistent with general, common law principles of contract construction, a court will not alter the clear language employed by the parties to a security agreement, *Selby v. England (Matter of California Pump & Manuf. Co.)*, 588 F.2d 717, 719 (9th Cir.1978), nor interpret away or supplement the obvious meaning of printed words. *State Bank of Albany v. United States (Matter of Riss Tanning Corp.*, 468 F.2d 1211, 1213 (2d Cir.1972).

Consequently, the Bank's claimed security interest, limited as it is to "accounts receivable", is not applicable to the licenses or the proceeds of the sale of these documents.

## II. AMC'S CLAIMED INTEREST

The latter principles expressed above similarly apply to AMC's claimed security interest in the licenses. For present purposes, the relevant language of the Addendum grants AMC an interest in Debtor's "general intangibles" " ... *now existing or hereafter arising as a result of the rental, lease or use by [Debtor] of any or all of the vehicles leased hereunder.*" As noted, the Master Fleet Agreements to which the foregoing was appended had

been in existence for at least twenty months prior to the granting of the security interest. Also, the Debtor had operated under the licenses for a considerable time prior to the date of the first lease contract with AMC. Again, general principles of construction mandate that the operative language of a security agreement be construed against the party responsible for its use. *Doyle v. Northrop Corp.*, 455 F.Supp. 1318, 1329 (D.N.J.1978); *Sun-Gro Plant Food, Inc. v. Lair (Matter of Lair)*, 39 B.R. 460, 461 (Bankr.W.D.Mo.1984); *Lader's Tiffany Feed & Supply Co. v. Kohl (Matter of Kohl)*, 18 B.R. 670, 671–72 (Bankr.W.D.Wis.1982).

The use of the phrase "now existing or hereafter arising as a result of", in the Addendum, without a comma preceding the coordinating participle "or", clearly reveals the parties' intention that AMC be granted a security interest in those stated general categories of collateral which either were in existence due to the rental, lease or use of automobiles under the already executed Master Lease Agreements, or which would arise in the future as a result of these agreements. The Court's interpretation of the AMC prepared document is the most reasonable under the circumstances. If the parties intended to grant AMC a security interest in general intangibles such as the licenses, then there was no reason for AMC to include the modifying language which refers to the Master Lease Agreements. AMC could have simply worded the Addendum to provide for the creation of a security interest in "all of the Debtor's existing general intangibles, and those hereafter created," and ignored any mention of its contracts with the Debtor. AMC's pointed reference to the existing Master Fleet Agreements in the Addendum clearly indicates that general intangibles like the licenses, existing prior to and independent of the execution of the Master Fleet Agreements, were not to be included in the ambit of the security agreement.

AMC urges the following interpretation of the Addendum. A security interest was granted in *any* of Debtor's existing proceeds, accounts and general intangibles as

of the date of the Addendum's execution, but only those proceeds, accounts and general intangibles which arose as a result of the Master Fleet Agreements *after* that date. This tortured reading of the Addendum leads to ludicrous results. The three general collateral categories (proceeds, accounts, and general intangibles) are referenced together. The Court is aware that AMC believes the Avis licenses are part of the "general intangibles" delineated in the Addendum, but what of the accounts and proceeds? Did AMC design the Addendum to grant a security interest in existing accounts and proceeds of *any* undefined good the Debtor sold or leased, or service it provided, *or* only those accounts and proceeds which were in existence or would thereafter arise as a result of the Master Fleet Agreements. The use of the term "proceeds" must be tied to some defined collateral source, and here it is the Master Fleet Agreements. Similarly, AMC's claim to a security interest in general intangibles must be restricted only to those "existing or hereafter arising as a result of" the same contracts.

AMC cannot expand the scope of the controlling language of its Addendum for the same reasons the Bank cannot transmute a readily identifiable "general intangible" into an "account". The principle that the language of security agreements is to be interpreted as written was recognized by the Ninth Circuit Court of Appeals in *First Mississippi Corp. v. Vogel (In re American Bioculture, Inc.),* 631 F.2d 640, 641 (9th Cir.1980). Hence the creditor was denied a security interest in the Debtor's foreign patents where the security agreement referenced only "United States Patents". Where a security agreement specified that a security interest was granted in furniture, fixtures, and inventory at a particular location, it was held that a security interest in similar items did not arise when the debtor moved to a new location. *In re Freeman,* 33 B.R. 234, 235 (Bankr.C.D.Cal. 1983). Similarly, the description of collateral as "all of the Debtor's farm and ranch machinery and equipment" was held not to include construction equipment owned by the Debtor. *Central Iowa Production*

*Credit Asso. v. DeSchamp (In re DeSchamp),* 44 B.R. 517, 520 (Bankr.N.D.Iowa 1984).

While these cases admittedly involve security agreements and collateral dissimilar from those under consideration, they illustrate the generally accepted view that judicial inquiry should first concern whether the written description may be reasonably construed to include the disputed property, followed by an examination of the parties' intentions that the description include the property. *See e.g. In re Shop-N-Go of Maine, Inc.,* 38 B.R. 731 (Bankr.D.Me. 1984); *But see Mitchell v. Shepard Mall State Bank,* 324 F.Supp. 1029, 1032 (D.Okla.1971) *aff'd* 458 F.2d 700 (10th Cir. 1972)(analysis of description is a question of law). The language employed by AMC in the addendum is not ambiguous. A straight-forward reading of the document leads to the pellucid interpretation that the Avis licenses are not, nor were they intended to be, a proper subject of the security interest granted.

## III.  APPLICATION OF THE DOCTRINE OF RES JUDICATA

■ AMC contends the doctrine of res judicata forestalls the Court from inquiring into the validity of its security interest in the licenses. AMC argues that by virtue of the seizure order entered by Justice Miller, the findings of fact contained therein, and Debtor's (and/or Bank's) failure to appeal therefrom, its interest is unassailable. AMC is in error on a number of fundamental points, for

'[a]lthough the CPLR provision governing the preliminary seizure of the property effects a number of changes in the former practice, it nevertheless remains clear that the seizure or replevying of the property need not occur at the outset of the proceeding, but may be instigated by the plaintiff after the action has been commenced and before a *final judgment* has been rendered. *Of course, the seizure of property in advance of judgment is not a final determination of the right thereto.* In fact, the property may be reclaimed or impounded under

express provisions of the statutes. 23 N.Y.Jur.2d *Conversion* § 133 (1982) (emphasis added; footnotes omitted).

The state court seizure order was interlocutory in nature,[7] being as it were merely a provisional remedy. The underlying and substantive grounds of the relief sought by AMC in the state suit were simply not resolved as a result of the order's entry. A primary element in the invocation of the doctrine of res judicata is the presence of a *final* judgment. *Kaplan v. Ruggieri*, 574 F.Supp. 631, 633, (E.D.N.Y.1983), *aff'd*, 742 F.2d 1436, (2d Cir.) *cert. denied*, 469 U.S. 835, 105 S.Ct. 128, 83 L.Ed.2d 70 (1984). *Acha v. Beame*, 570 F.2d 57, 62 (2d Cir. 1978); *Crane Co. v. American Standard, Inc.*, 490 F.2d 332, 339 (2d Cir.1973), *on remand*, 439 F.Supp. 945 (S.D.N.Y.1977). Interlocutory decrees or judgments cannot support the res judicata defense. *Sterling Drug, Inc. v. Weinberger*, 509 F.2d 1236, 1240 (2d Cir.1975); *Aghnides v. Aghnides*, 159 N.Y.S.2d 343, *aff'd*, 4 A.D.2d 498, 167 N.Y.S.2d 201 (N.Y.App.Div., 1st Dep't 1957), *appeal denied* 5 A.D.2d 767 (N.Y. App.Div. 1st Dep't), *appeal denied*, 4 N.Y.2d 676, 173 N.Y.S.2d 1025, 149 N.E.2d 358, *U.S. cert. denied*, 358 U.S. 823, 79 S.Ct. 36, 3 L.Ed.2d 63 (1958); *Diaz v. Indian Head, Inc.*, 686 F.2d 558, 562-63 (7th Cir.1982); *United States v. Stonehill*, 420 F.Supp. 46, 52 (C.D.Cal.1976), *aff'd in part, rev'd in part*, 702 F.2d 1288 (9th Cir.1983), *cert. denied*, 465 U.S. 1079, 104 S.Ct. 1440, 79 L.Ed. 761 (1984); *Aristocrat Health Club of Hartford, Inc. v. Chaucer*, 451 F.Supp. 210, 214 (D.Conn.1978). A judgment is on the merits if it completely disposes of the underlying cause of action, or determines that the plaintiff has no cause of action. *Cromwell v. County of Sac*, 94 U.S. 351, 352-53, 24 L.Ed. 195 (1877); *Har-*

*per Plastics, Inc. v. Amoco Chemicals Corp.*, 657 F.2d 939, 943 (7th Cir.1981); *Saylor v. Lindsley*, 391 F.2d 965, 968 (2d Cir.1968), *on remand*, 302 F.Supp. 1174 (S.D.N.Y.1969).

Justice Miller's order did not fully and completely resolve the dispute between AMC and Debtor. The language employed in the findings portion of the seizure order (a document prepared by AMC's counsel) respecting the alleged security interest, curiously fails to use the specific language of limitation utilized in the Addendum. The Court is not bound to give deference to such a determination, and will not do so.

As noted above, AMC may have had a default judgment entered against Debtor in the state court proceedings shortly before the filing of the bankruptcy petition. The Court can only speculate on this point, as competent evidence of such an action has not been presented for consideration. Indeed, the only evidence of such an occurrence is the unsigned, unfiled photocopy of a statement of judgment and notice of entry attached to Debtor's counsel's affidavit of December 9, 1986. AMC has never before raised the existence of a default judgment against Debtor, as evidenced by the complete lack of such an allegation during these proceedings, as well as those occurring during consideration of Debtor's action for the return of the licenses pursuant to Code § 542.[8] In any event, the Court observes that the clerk of the New York Supreme Court would have had authority to enter a default judgment only where the claim was for a sum certain. CPLR § 3215. AMC did not pray for a declaration of its rights in the licenses, and in any event, default judgment upon entry by the clerk could not have ensued had it done so.[9]

---

**7.** *"Interlocutory.* Provisional; interim; temporary; not final. Something intervening between the commencement and the end of a suit which decides some point or matter, but is not a final decision of the whole controversy." BLACK'S LAW DICTIONARY (5th ed.1979).

**8.** *See In re Gordon Car & Truck Rental, Inc.*, 65 B.R. 371, Memorandum-Decision (Bankr.N.D.N.Y.1986) (Gerling, B.J.).

**9.** "If several claims are pleaded and any one of them demands such relief as would require an

application to the court, the clerk cannot enter the default even if one or several of the other claims asserted is for a 'sum certain.' *See Geer, Dubois & Co. v. O.M. Scott & Sons Co.*, 25 A.D.2d 423, 266 N.Y.S.2d 580, 1st Dep't 1966. ...

When the action is not for money only the clerk cannot enter a default judgment. This would apply to all of the equitable actions and to those law actions which seek relief other than money only, such as ejectment and replevin." Siegel, PRACTICE COMMENTARIES, C3215:2, CPLR § 3215.

## IV. BANK'S CLAIM OF ADMINISTRATIVE PRIORITY

As alternative relief set forth in its Motion for Summary Judgment filed January 23, 1987, the Bank sought Court approval of its claim for an administrative priority. In sum, the Bank alleges that Debtor has "apparently" used pre-petition accounts receivable for post-petition operations which "materially assisted in preserving and maximizing Debtor's estate for the benefit of all creditors ...". This claim was not raised by the Bank in either its Motion to Intervene, nor in its responsive pleadings filed in connection with Debtor's adversary proceeding.

The request is not properly before the Court for consideration, and even if it were, the Bank's own Motion for Summary Judgment makes clear that sufficient questions of material fact are so far unresolved as to make summary judgment inappropriate. Should the Bank believe itself entitled to an administrative priority claim, it may avail itself of the relief and procedures set forth in Code § 502, § 503 and Fed.R. Bank.P. 9014.

## CONCLUSION

The Debtor's interest in the proceeds generated by the sale of the Avis franchise license agreements is free and clear of the secured claim interests of either the Bank or AMC. The Bank does not have an interest in the licenses as the documents are "general intangibles" as defined by N.Y.U. C.C. § 9–106, and its security agreement with Debtor does not cover such collateral. AMC does not have an interest in the licenses for its security agreement with Debtor limited its interest in "general intangibles" to those which existed or thereafter arose as a result of the underlying Master Fleet Agreements. Finally, the Bank's claim for an administrative priority claim is not properly before the Court, and is in any event not the appropriate subject for summary judgment.

IT IS SO ORDERED.