In re GORDON CAR AND TRUCK RENTAL INC., Debtor.

GORDON CAR AND TRUCK RENTAL, INC., Plaintiff,

v.

AMERICAN MOTORS LEASING COR-PORATION and AMC Leasing Corporation, Defendants.

No. 87-CV-1274.

United States District Court, N.D. New York.

Dec. 4, 1987.

Brett W. Martin, Utica, N.Y., for Gordon Car & Truck Rental, Inc.

Menter Rudin & Trivelpiece (Jonathan D. Deily, of counsel), Albany, N.Y., for American Motors Leasing & AMC Leasing.

Penberthy Kelly & Walthall (William W. Kelly, of counsel), Utica, N.Y., for Bank of Utica.

## MEMORANDUM-DECISION AND ORDER

McCURN, District Judge.

Appellants, American Motors Leasing Corporation and AMC Leasing Corporation (collectively referred to as "AMC") and the Bank of Utica ("Bank"), appeal from the bankruptcy court's June 15, 1987 decision 75 B.R. 466. In that decision, Judge Gerling reached several conclusions of law, two of which are the subject of this appeal. Specifically, he concluded that neither AMC nor the Bank had a security interest in certain license agreements, or the sale proceeds thereof. The appellee/debtor, Gordon Car and Truck Rental, Inc. ("Gordon"), previously had rights in those license agreements. For the reasons set forth herein, the bankruptcy court's decision is affirmed.

## BACKGROUND

In 1956 Gordon began entering into "Exclusive License Agreements" ("license agreements") with Avis-Rent-A-Car System, Inc. ("Avis"). Over time, Gordon entered into five such license agreements with Avis for five separate business locations. Those license agreements gave Gor-

don certain rights to use the Avis plan or system for conducting the business of renting vehicles and to use the Avis name.[1]

In 1980 and thereafter, Gordon entered into at least four separate "Master Fleet Vehicle Lease Agreements" ("Master Fleet Agreements") with AMC. In March, 1984, at AMC's request, Gordon executed an "Addendum" to each of those Master Fleet Agreements. The Addendum was drafted by AMC and stated, in relevant part:

> As further security for the performance of this lease, Lessee [Gordon] hereby grants, assigns and conveys to Lessor [AMC] a continuing security interest in any and all proceeds, accounts and general intangibles (as defined in the Uniform Commercial Code) now existing or hereafter arising as a result of the rental, lease or use by Lessee of any or all of the vehicles leased hereunder.

After executing the Addendum Gordon returned it, together with the necessary Uniform Commercial Code ("U.C.C.") financing statements, to AMC.

On August 28, 1985, Gordon filed for bankruptcy under Chapter 11 of the Bankruptcy Code ("the Code"). "For reasons unknown," the original license agreements between Gordon and Avis were given to AMC for "safekeeping." Bankruptcy Decision at 4. On January 16, 1986, the bankruptcy judge ordered AMC to return the original license agreements to Gordon because those agreements were property of the bankrupt estate. The license agreements were eventually assigned to a Mr. Castle at the close of an auction and the sale proceeds thereof placed in escrow.

On August 18, 1986, Gordon commenced an adversary proceeding against AMC seeking a determination regarding AMC's claimed security interest in the license agreements. Subsequently, the Bank was allowed to intervene in that proceeding as a defendant. The Bank also claims a security interest in those license agreements, allegedly arising out of a September, 1977 perfected security agreement it had with Gordon. That security agreement granted the Bank, among other things, a security interest in "all accounts receivable now owned or hereafter created."

After the commencement of the adversary proceeding, the Bank moved for summary judgment and AMC moved to dismiss Gordon's complaint and the Bank's cross-claims. The parties then stipulated to having the bankruptcy judge make a "final determination on the merits" with respect to all outstanding claims to the license agreements and the proceeds thereof. Bankruptcy Decision at 467.

## DISCUSSION

### I. *Standard of Review*

Section 157(b)(1) of the Bankruptcy Code provides:

> Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

28 U.S.C. § 157(b)(1) (West Supp.1987). As a petition for relief filed pursuant to Chapter 11 of the Code, this was clearly a "case under title 11" over which the bankruptcy

---

1. Specifically, the license agreements provided, in pertinent part:

> *Whereas*, Licensor is the exclusive owner of, and has the right to use and to license others to use, a plan or system for conducting the business of renting vehicles, including the renting of trucks, without drivers, hereinafter called "rent-a-truck business" and renting passenger motor vehicles, without drivers, hereinafter called "rent-a-car business", which plan or system consists, among other things, of uniform methods of operation, accounting, advertising service and publicity, courtesy and credit card service, kind and amount of insurance protection, method of procuring insurance protection and equipment, style and character of equipment, furnishings and appliances used in the conduct of said business, methods of procuring business and referral of business, and the right to use the name "Avis", "Avis System", "Avis Rent A Truck System" and "Avis Rent A Car System", all of which constitute a part of said system, which system is generally known as Avis Rent A Car System and is sometimes referred to hereinafter as the "System";....

AVIS RENT A CAR SYSTEM, INC. EXCLUSIVE LICENSE AGREEMENT.

court had jurisdiction to render an order making a final determination on the merits of the outstanding claims to the licensing agreements, and that order is appealable to this court.

Bankruptcy rule 8013 sets forth the applicable standard of review for dispositive orders such as the present one rendered pursuant to the provisions of § 157. That rule provides that a district court may not set aside a bankruptcy court's findings of fact, unless those findings are clearly erroneous. When the parties challenge the bankruptcy court's conclusions of law, as they are here, the court must "make an independent determination of the applicable law." *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82, 88 (2d Cir. April 9, 1987) (citation omitted). After such plenary review, the district court may affirm, modify, or reverse an order of the bankruptcy court. 11 U.S.C. Rule 8013 (West 1984).

## II. *The License Agreements*

The first issue presented on this appeal is the scope of the security interest which the Bank has in Gordon's accounts receivable. The Bank claims that its security interest in Gordon's accounts receivable includes a security interest in the Avis license agreements, and the proceeds thereof. The bankruptcy court found that the license agreements were general intangibles as defined in § 9–106 of the U.C.C., because those agreements did not grant a right to payment for goods sold or leased or for services rendered. Bankruptcy Decision at 468–71. Thus, the bankruptcy court concluded that the Bank's security interest in Gordon's accounts receivable did not include a security interest in the Avis license agreements.

The Bank asserts on this appeal, however, that its security interest in accounts receivable is tantamount to a security interest in contract rights. Further, because those license agreements are contracts, the Bank asserts it has a security interest in the license agreements and the proceeds thereof. Finally, the Bank asserts that, at the very least, because it has a security

interest in Gordon's accounts receivable, it is entitled to the sale proceeds of the license agreements because those proceeds are an account receivable. The Bank's argument is untenable.

Based upon § 9–106, the Bank contends that it has a security interest in Gordon's "contract rights" by virtue of its perfected security interest in Gordon's accounts receivable. Section 9–106 of the U.C.C. defines an account as:

[A]ny right to payment *for goods sold or leased or for services rendered* which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

N.Y.U.C.C. § 9–106 (McKinney Supp.1987) (emphasis added). Further, § 9–106 defines general intangibles as:

[A]ny personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money.

*Id.* Prior to 1972, § 9–106 also included the following definition of contract rights:

[A]ny right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper.

N.Y.U.C.C. § 9–106 (McKinney 1964). In 1972, the definition of contract rights was eliminated as unnecessary and the definition of accounts was amended to include contract rights. *See*, Draftmen's Statement of Reasons for 1972 Changes in Text, U.C.C. § 9–106 (1972). Therefore, the Bank is correct in asserting that its filing for a security interest in Gordon's accounts receivable also includes a filing for Gordon's contract rights.

The inquiry cannot end there, however. Simply because the Bank has a security interest in Gordon's contract rights does not necessarily mean that it has a security interest in the license agreements. The critical element for both accounts and contract rights, as previously recognized under the U.C.C., is that the right to payment therefrom must arise from the sale or lease of goods or the rendering of services. As the bankruptcy judge astutely pointed out, "the very source cited by the Bank recog-

nizes" that requirement. Bankruptcy Decision at 469. Specifically, quoting from Hawkland, 8 Uniform Commercial Code Series, the bankruptcy court stated:

> Under the 1972 Code, the definition of accounts is sufficiently broad to include within it contract rights, *so long as they relate to the sale or lease of goods or the rendering of services....* Where the receivable arises other than from the sale or lease of goods or rendering of services, or the contract that will give rise to the receivable is other than for the sale or lease of goods or the rendering of services, *the resulting right to payment is not an account, but is a general intangible.*

Bankruptcy Decision at 469–70, n. 6. In addition, the Official Comment to § 9–106 provides further insight into how the term "general intangible" as it is defined in § 9–106 should be construed. In particular, the Official Comment provides in pertinent part:

> The term "general intangible" brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security. Examples are goodwill, literary rights and rights to performance.

N.Y.U.C.C. Official Comment (McKinney 1964).

In light of the foregoing, it is clear that, as the bankruptcy judge noted, although the license agreements are written contracts, they did not give Gordon the "right to payment for goods sold or leased or for services rendered." Therefore, those license agreements cannot be considered an account under § 9–106.

The Bank tries to bring the license agreements into the scope of its security interest in Gordon's accounts receivable by asserting "that the right to lease automobiles to others under the AVIS logo and the AVIS marketing system constituted the rendering of a service under UCC Section 9–106, ..." Bank Memorandum of Law at 10. The Bank ignores the fact, however, that those license agreements did not give Gordon the right to receive payment for goods sold or leased, or services rendered. The license agreements simply allowed Gordon to use the Avis business system and logo.

As Gordon correctly stated, such rights to payment would arise in the context of Gordon's rental agreements with customers. Gordon's Memorandum of Law at 6. For example, Gordon would enter into a rental contract with a customer whereby the customer would rent the car for a certain amount of time and the customer would pay Gordon for the use of that car. When Gordon made the car available to the customer, the customer would have the obligation to compensate Gordon for the use of that car. Unlike the license agreements, the right to payment under those circumstances would properly be considered an account as that term is defined in § 9–106 of the U.C.C.

Additionally, there is no merit to the Bank's contention that it is entitled to the sale proceeds of the license agreements because those proceeds are an account receivable. Those proceeds did not arise until *after* Gordon filed its Chapter 11 bankruptcy petition, and there is absolutely no indication that the Bank had a security interest in any postpetition proceeds. The Bank's security interest in Gordon's accounts receivable does not mandate the conclusion that the Bank had a security interest in the postpetition sale proceeds of the license agreements.

Finally, as the bankruptcy judge recognized, improper or imprecise characterization of collateral will defeat a claimed security interest. That is so because of the requirement that parties identify the collateral which is the subject of a security interest with reasonable specificity. *In re Laminated Veneers Co., Inc. v. Commercial Trading Company, Inc. v. Bassin*, 471 F.2d 1124, 1125 (2d Cir.1973) (citations omitted). As in construing any contract, courts will not alter the clear, unambiguous language used by the parties to a security agreement. *Selby v. England (Matter of California Pump & Manuf. Co.)*, 588 F.2d 717, 719 (9th Cir.1978). Similarly, courts should not "interpret away the obvious meaning of the words involved nor supply

additional meanings" to a contract. *In re Riss Tanning Corporation*, 468 F.2d 1211, 1213 (2d Cir.1972).

■ Here, the language of the Bank's security agreement with Gordon was unequivocal. It provided that the Bank had a security interest in Gordon's "accounts receivable." It did not give the Bank a security interest in Gordon's general intangibles. Because the Avis license agreements do not give rise to the right to payment for goods sold or leased or for services rendered, those agreements are general intangibles within the meaning of § 9–106. Therefore, because the Bank's security agreement was limited to creating a security interest in accounts receivable, and because it did not specify a separate and distinct category of collateral for general intangibles, the bankruptcy court properly concluded that the Bank did not have a security interest in the license agreements or the sale proceeds thereof.

■ The second issue presented on this appeal is the scope of AMC's security agreement created by the Addendum to the Master Fleet Agreements. AMC contends that the Addendum entitles it to a security interest in the Avis license agreements and the proceeds thereof. As set forth above, AMC has a security interest in Gordon's general intangibles "...now existing or hereafter arising *as a result of the rental, lease or use by [Debtor] of any or all of the vehicles leased hereunder.*" The bankruptcy court found that AMC did not have a security interest in the license agreements because of the highlighted words of limitation in AMC's security agreement. Specifically, the bankruptcy court found that AMC's failure to place a comma before the or, "clearly reveals the parties' intention that AMC be granted a security interest in those stated general categories of collateral which either were in existence due to the rental, lease or use of automobiles under the already executed Master Lease Agreements, or which would arise in the future as a result of these agreements." Bankruptcy Decision at 471.

AMC asserts that the bankruptcy court's interpretation of AMC's security agreement was graminatically unreasonable. AMC urges that its security agreement should be construed as giving AMC a security interest in the license agreements beacuse those agreements were general intangibles existing prior to the creation of the security agreement by the Addendum. AMC's interpretation is unreasonable, however. As the bankruptcy court soundly reasoned:

> If the parties intended to grant AMC a security interest in general intangibles such as the licenses, then there was no reason for AMC to include the modifying language which refers to the Master Lease Agreements. AMC could have simply worded the Addendum to provide for the creation of a security interest in "all of the Debtor's existing general intangibles, and those hereafter created," and ignored any mention of its contracts with the Debtor. AMC's pointed reference to the existing Master Fleet Agreements in the Addendum clearly indicates that general intangibles like the licenses, existing prior to and independent of the execution of the Master Fleet Agreements, were not to be included in the ambit of the security agreement.

Bankruptcy Decision at 471. Therefore, if AMC had intended to include the license agreements in its security agreement, it certainly could have done so without reference to the Master Lease Agreements.

AMC further asserts that the bankruptcy court's interpretation was unreasonable based upon the position of the parties when they executed the Addendum and based upon the general business relationship between them. AMC thus urges this court to, at the very least, remand this matter to the bankruptcy court for an evidentiary hearing on the issue of the intent of the parties with respect to the Addendum.

■ As previously discussed, however, the security agreement is clear on its face. Therefore, the court need not consider the intent of the parties and their business relationship; nor was there any need for the bankruptcy court to make such an inquiry. *See, e.g., Matter of California Pump & Mfg. Co., Inc.*, 588 F.2d 717, 719–

20 (9th Cir.1978) (Court refused to allow the creditor to adduce parol evidence in an attempt to alter the unambiguous language of the agreement.); *In Re Martin Grinding & Mach. Works, Inc.*, 42 B.R. 888–91 (N.D.Ill.Bkrtcy.1984) ("[W]here a security agreement clearly grants a specific, unambiguous security interest, parol evidence cannot enlarge the security interest beyond that stated in the security agreement.") Contrary to AMC's position at oral argument, there is not a two-prong test for determining the meaning of a security agreement. Courts are not required to consider the language of the security agreement *and* the intent of the parties. The latter inquiry is only made when, unlike the present case, there is ambiguity in the security agreement. Consequently, AMC's request to have this matter remanded to the bankruptcy court is denied.

In light of the foregoing, the court concludes that the bankruptcy court's conclusions of law regarding the claimed security interests of AMC and the Bank were not in error. Accordingly, the bankruptcy court's June 15, 1987 decision in the present case is hereby affirmed.

IT IS SO ORDERED.