In re DOCTORS HOSPITAL OF HYDE PARK, INC., Debtor.

Gus A. Paloian, Chapter 11 Trustee of Doctors Hospital of Hyde Park, Inc., Plaintiff,

v.

LaSalle Bank National Association, f/k/a LaSalle National Bank, as Trustee for Certificate Holders of Asset Securitization Corporation Commercial Pass–Through Certificates, Series 1997, D5, by and through its servicer, ORIX Capital Markets, LLC, Defendant.

Bankruptcy No. 00 B 11520.
Adversary No. 11 A 01983.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

June 6, 2012.

578

John Costello, Esq., Scott A. Semenek, Jeffrey L. Gansberg, Esq., John E. Frey, Esq., Yeny Estrada, Edwards Wildman

Palmer LLP, Chicago, IL, for Debtor/Plaintiff/Trustee.

Lewis T. Stevens, Esq., Michael Warner, Esq., Simon Warner & Dolby LLP, Fort Worth, TX, Howard L. Adelman, Esq., Adam P. Silverman, Esq., Adelman, Gettleman, Merens, Berish & Carter, Ltd., Chicago, IL, for LaSalle Bank.

N. Neville Reid, Fox, Hefter, Swibel, Levin & Carroll LLP, Chicago, IL, for Unsecured Creditors Committee.

David T.B. Audley, Esq., Michael T. Benz, Esq., Richard Wohlleber, Chapman and Cutler LLP, Chicago, IL, for LaSalle Bank N.A. as Trustee for Certificate-Holders of Asset Securitization Corp. Commercial Mortgage Pass–Through Certificates, Series 1997 D5, and through its servicer, ORIX Capital Markets, LLC.

Stacy J. Flanigan, Winston & Strawn LLP, Chicago, IL, for Dan K. Webb.

Kathryn M. Gleason, Esq., Chicago, IL, Office of the U.S. Trustee.

James M. Witz, Esq., Frances Gecker, Esq., Freeborn & Peters, Chicago, IL, for Stephen Weinstein.

Nancy A. Peterman, Esq., Jane B. McCullough, Esq., Kimberly M. DeShano, Esq., Greenburg Traurig PC, Chicago, IL, for Asset Securitization Corp. and Nomura Asset Capital Corp.

### MEMORANDUM OPINION ON CHAPTER 11 TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LASALLE'S CLAIM TO CERTAIN ASSETS

JACK B. SCHMETTERER,
Bankruptcy Judge.

In the Chapter 11 Bankruptcy case filed by the debtor Doctors Hospital of Hyde Park ("Debtor"), a claim was filed by LaSalle Bank National Association, f/k/a LaSalle National Bank as Trustee for certain asset certificateholders of Asset Securitization Corporation Commercial Mortgage Pass–Through Certificates, Series 1997, D5 ("LaSalle") for $60,139,317.04 ("Claim"). On his objection to the Claim, a Motion for "Partial" Summary Judgment was filed by the Chapter 11 Trustee, Gus A. Paloian ("Trustee"). The Motion sought rulings to limit the extent of LaSalle's lien on certain property of the Debtor.

Upon review of the Trustee's objections to LaSalle's Claim, it was ordered that all objections consisting of counterclaims as defined in Fed. R. Bankr.P. 3007(b) and 7001(2) were to be re-pleaded as separate counts in an adversary proceeding. The Trustee complied with that Order and filed the above-captioned twenty-nine count adversary counterclaim Complaint challenging LaSalle's Claim (11 A 01983, hereinafter the "2011 Adversary"). Counts II through XVIII, X through XIV, and XVIII of the Complaint pertain to issues raised in Trustee's Motion for Partial Summary Judgment.[1]

### Introduction

The dispute raised by the Trustee's Motion centers on interpretation of several loan documents executed by Debtor. The Trustee's interpretation would exclude certain of the Debtor's assets from LaSalle's lien; LaSalle's interpretation would extend its lien to those assets.

### Loan Agreement

Doctor's Hospital of Hyde Park was an Illinois Subchapter S corporation con-

---

1. The Trustee filed two different motions for partial summary judgment. Briefing on the Trustee's "Motion for Summary Judgment to Offset LaSalle's Recovery from Third Party Against LaSalle's Claim" has been suspended by Order of October 28, 2011 pending conclusion of work on a remanded Adversary proceeding (02 A 00363).

trolled by Dr. James Desnick from 1992 to 2000. It operated hospital facilities at 5800 Stony Island Avenue, Chicago, Illinois. In August 1997, Nomura Asset Capital Corporation ("Nomura") loaned $50 million to Doctor's Hospital through HPCH, LLC, which owned the Hospital's building and land.[2] (Jt. Ex. 202, ¶ 26) The loan from Nomura to Doctors Hospital was governed by a Loan Agreement and evidenced by a Promissory Note, both dated August 28, 1997 and executed by the borrower HPCH, LLC in favor of the lender Nomura.

Doctor's Hospital executed a Guaranty and Suretyship Agreement ("Guaranty") in favor of Nomura dated August 28, 1997. Pursuant to the Guaranty, Doctors Hospital became surety to Nomura for the loan amount. (Jt. Ex. 202, ¶ 73) As security for performance of its obligations under the Guaranty, Doctors Hospital also executed an Operator Security and Pledge Agreement (the "Security Agreement"), also dated August 28, 1997. (Jt. Ex. 202, ¶ 75)

On October 24, 1997, Nomura sold and transferred all of its rights, title and interests in and to the Nomura Loan, along with other mortgage loans, to the Asset Securitization Corporation ("ASC"). (Jt. Ex. 202, ¶ 100, 101). At the same time, ASC entered into a Pooling and Servicing agreement selling ASC's right, title and interest in the Nomura Loan to the LaSalle Bank. (Jt. Ex. 202, ¶ 100, 101). Therefore, LaSalle is successor in interest to Nomura in this bankruptcy case.

*Bankruptcy and Proof of Claim*

Doctors Hospital filed its Chapter 11 bankruptcy petition on April 17, 2000. (Jt. Ex. 202, ¶ 20). On March 28, 2001, La-Salle Bank filed its Proof of Claim on Official Form 10. In the "Statement of Claim," attached as an exhibit to Official Form 10, LaSalle stated that as collateral it held liens on all personal property of the Debtor. (LaSalle Ex. 12, at 1) It further stated the Claim was based on the contractual repayment obligation of the Debtor, and the liens and security interests granted to secure the repayment obligation, arising from certain loan agreements. (LaSalle Ex. 12, at 1)

In 2002, Doctors Hospital filed an Adversary Complaint pleading twenty-eight counts against a number of individuals and entities, including LaSalle Bank, seeking recovery of funds for the bankruptcy estate on several theories. (02 A 00363, Dkt. 1, the "2002 Adversary") As to LaSalle, the Trustee sought to void the Debtor's Guaranty and the liens securing that Guaranty, and to recover certain payments of rent as fraudulent transfers. Allegations of the 2002 Adversary proceeding against La-Salle were consolidated for purposes of trial in 2006 with the Trustee's objections seeking to void LaSalle's Claim. However, objections to the amount, extent, and scope of LaSalle's lien were not tried. Prior to the 2006 trial, Doctors Hospital moved for summary judgment arguing that the Guaranty was non-recourse and seeking to limit LaSalle's Claim to the value of its collateral. That motion was granted on September 22, 2005. (*Id.*, Dkt. 481)

After trial on remaining issues, on March 23, 2007, in the 2002 Adversary proceeding judgment was entered voiding Doctors Hospital's Guaranty as well as the

---

**2.** Ownership of the real estate and certain fixtures were titled to HPCH, a Delaware limited liability company. HPCH, LLC was owned 99% by HPCH Partners, L.P. and 1% by its managing member, HP Membership. Dr. James Desnick owned 100% of HP Mem-

bership and a controlling interest in HPCH Partners, L.P. Doctors Hospital managed the hospital's business operations. Doctors Hospital rented the hospital property from HPCH, LLC.

liens and security interests granted by Doctors Hospital to secure the guaranty as fraudulent transfers. *Doctors Hosp. of Hyde Park, Inc. v. Dr. James H. Desnick, et al., (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 874 (Bankr.N.D.Ill. 2007). That decision was based, in part, on a ruling that the Debtor incurred those obligations at a time when it was insolvent. *Id.* On March 27, 2007, separate orders were entered in the bankruptcy case and the 2002 Adversary proceeding denying LaSalle's Claim. On appeal by both parties, a District Court Judge affirmed those orders and judgments. On further appeal, however, a Seventh Circuit Opinion vacated those decisions in part.[3] *Paloian v. LaSalle Bank, N.A. (In re Doctors Hosp. of Hyde Park, Inc.)*, 619 F.3d 688 (7th Cir.2010). Of importance to issues to be decided, the Seventh Circuit Opinion stated that Doctors Hospital was solvent in August of 1997, a view contrary to the possibility that the Guaranty could be voided as a fraudulent transfer. *Id.* at 695.

### Settlement Agreements

Prior to trial on allegations in the 2002 Adversary Complaint, Debtor reached settlements with certain defendants, namely, a group of defendants led by James Desnick (the "Desnick Settlement"), Daiwa Healthco–2, LLC, and HFG Healthco–4, Inc., (collectively, the "Daiwa Settlement"). (Movant's Ex. 14). Debtor also reached a settlement with Dan K. Webb (the "Webb Settlement") prior to commencing litigation against him. The claims released by the settlement agreements made with these parties are referred to herein collectively as the "Settled Claims."

The Complaint in the 2002 Adversary asserted that certain payments made to Daiwa by Doctors Hospital should be avoided as fraudulent transfers, preferences or post-petition transfers. (*See* Movant's Ex. 14, ¶ 194–215) Daiwa Funding settled the Doctors Hospitals 2002 Adversary Complaint against Daiwa Funding for a payment of $360,000 in a settlement agreement approved on February 26, 2003. (Movant's Ex. 9).

Dr. James Desnick settled Doctors Hospital's Complaint against him in a settlement agreement dated May 15, 2003 for payment of $6 million dollars and other consideration. (Movant's Ex. 11). Claims against Desnick in the 2002 Adversary included breach of fiduciary duty, fraudulent transfers, preferences, wrongful payment of dividends, and conversion. LaSalle contested the Desnick Settlement agreement, but its objections were overruled and the settlement agreement finally approved on June 7, 2004. (Movant's Ex. 12). LaSalle appealed the Desnick Settlement to the District Court, which overruled LaSalle's objections and affirmed approval of that Settlement. *See LaSalle Bank Nat. Ass'n v. Doctors Hosp. of Hyde Park, Inc.*, 2005 WL 1766370 (N.D.Ill.2005). LaSalle then appealed the District Judge's decision to the Seventh Circuit Court of Appeals, which affirmed the rulings below. *See In re Doctors Hosp. of Hyde Park*, 474 F.3d 421 (7th Cir.2007).

Doctors Hospital also entered into a settlement agreement with Dan K. Webb, as to its claims against him, for payment of $270,000. Doctors Hospital asserted against Webb claims similar to those pleaded in the 2002 Adversary against sev-

---

**3.** On August 27, 2010, the Seventh Circuit issued *Paloian v. LaSalle Bank, N.A.,* 619 F.3d 688 (7th Cir.2010), reversing in part the Bankruptcy court's determinations in *In re Doctors Hospital of Hyde Park, Inc.,* 360 B.R. 787 (Bkrtcy.N.D.Ill.2007). The matter was remanded to the bankruptcy court for proceedings consistent with the Seventh Circuit Opinion. The issues to be determined on remand relate to the date of the Hospital's insolvency and the status of MMA Funding. *See Paloian,* 619 F.3d at 696.

eral defendants, *i.e.*, that certain payments made to Webb from Doctors Hospital were recoverable as fraudulent transfers. However, Webb was not joined as a defendant in the 2002 Adversary Complaint because when it was filed he had already been engaged in ongoing settlement negotiations with Doctors Hospital. LaSalle contested the Webb settlement agreement, but its objections were overruled and the settlement agreement finally approved on November 3, 2003. (Movant's Ex. 10).

*LaSalle's Claim*

The Trustee's current Motion in this adversary proceeding was precipitated by what he calls a "belated" assertion by LaSalle that the scope of its liens extended to all assets held by Debtor. (Movant's Mem. Supp. 4) The Trustee, through this Motion for Partial Summary Judgment, seeks a finding that those liens do not extend to proceeds from the Settled Claims.

In its Proof of Claim filed on March 26, 2001, LaSalle checked the box on the claim form indicating that "personal property" was the source of its collateral security. (LaSalle Ex. 12) In its "Statement of Claim" filed as an exhibit to Official Form 10, LaSalle stated that as collateral it holds liens and security interests in "all [Debtor's] personal property." That Claim is assertedly based on the contractual repayment obligation of the Debtor, and the liens and security interests granted to secure the repayment obligation, arising from several loan documents and agreements.

LaSalle argues that pursuant to the Guaranty, Debtor guaranteed the loan made to HPCH, LLC. (*Id.*) LaSalle also stated the Debtor also executed an "Operator, Pledge and Security Agreement" ("Security Agreement") as security for its performance of its obligations under the Guaranty. (*Id.*) Pursuant to the Security

Agreement, LaSalle further argues, Debtor pledged collateral referenced in that agreement and granted a lien in, among other things, all of Debtor's personal property. (*Id.*) Further, it asserts that on or before the filing of Debtor's bankruptcy petition, HPCH, LLC was in default of the loan and promissory note to Nomura, thus giving rise to the liabilities and financial obligations of the Debtor under its Guaranty.

In the process of refining issues for trial on the 2002 Adversary, LaSalle prepared, upon request by the bankruptcy judge, a "Summary Statement to the Court Regarding its Proof of Claim" (hereinafter "Summary Statement"). In the Summary Statement, LaSalle argues it was also granted a lien on all of the Debtor's property in exchange for use of its cash collateral by Debtor. (Claimant's Summary Statement to the Court Regarding its Proof of Claim, p. 3 n. 3) On May 22, 2000, the "Third Order (1) Authorizing Interim Use of Cash Collateral, (2) Providing Adequate Protection and (3) Rescheduling Final Hearing" ("Third Cash Collateral Order") was agreed to and entered herein. The Third Order, in relevant part, granted LaSalle Bank a:

> valid, binding, enforceable and perfected lien ... with the same priority and extent as existed prepetition, in all presently owned or hereafter acquired property and assets of the Debtor, of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising, excluding, however, the proceeds of any recoveries under Sections 506(c), 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code.

(Third Cash Collateral Order, 00 B 11520 Dkt. 125 ¶ 2) LaSalle also suggested in its Summary Statement that Debtor's assets may secure payment of its Claim under 11

U.S.C. § 507(b). LaSalle has not elaborated on that statement so it is not discussed here.

*Motion for Partial Summary Judgment On LaSalle's Claim as to Certain Assets*

Prior to filing of the above-captioned 2011 Adversary proceeding and later in response to an Order for Supplement Briefs (Dkt. No. 1468), the Chapter 11 Trustee identified each issue on which summary judgment is sought in this proceeding (Dkt. No. 1469), now set forth in separate counts. The issues thus identified and the corresponding counts are:

1. Whether LaSalle's lien on general intangibles extends to proceeds of certain settlements or to proceeds of the sale of parking lot real estate. (Counts III, IV, XII, XIII, XIV)

2. Whether LaSalle's liens on the settlement proceeds are subject to equitable subordination. (Counts V, VI, VII)

3. Whether LaSalle has waived its lien on the settlement proceeds. (Counts VIII and IX of the New Adversary)

4. Whether *res judicata* precludes LaSalle from asserting its lien on settlement proceeds. (Count X)

5. Whether LaSalle's lien does not extend to preference or fraudulent transfer recoveries. (Counts XI and XVII)

6. Whether LaSalle has no lien on settlement proceeds under the Uniform Commercial Code as adopted in New York. (Count II)

### Jurisdiction

This Adversary proceeding arises out of and relates to the Chapter 11 case of Doctors Hospital, No. 00 B 11520. Venue is proper in this District pursuant to 28 U.S.C. § 1409.

Jurisdiction lies under 28 U.S.C. §§ 157(b)(2)(C) and (K)[4] and 1334 and District Court Internal Operating Procedure 15(a). Each Count implicated by the pending Motion comprise counterclaims to the LaSalle Claim against the Bankruptcy Estate seeking determination of the extent and validity of liens supporting that Claim, statutory "core" authority lies under 28 U.S.C. § 157(b)(2)(C) and (K) to adjudicate finally those Counts.

However, that authority was arguably called into question by the Supreme Court decision in *Stern v. Marshall*, —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). That decision held that the Constitution requires the "removal of [certain] counterclaims ... from core bankruptcy jurisdiction" so as to limit final judgments thereon to the purview of an Article III judge, 131 S.Ct. at 2620, unless there is consent by the parties to entry of final judgment by the bankruptcy judge. *In re Olde Prairie Block Owner, LLC,* 457 B.R. 692, 699 (Bankr.N.D.Ill.2011). The *Stern* holding was directed at non-bankruptcy law counterclaims that are not necessarily resolved in the process of ruling on a creditor's proof of claim. *Stern,* S.Ct. at 2619–20. Based on this holding, a bankruptcy judge's authority to enter final judgment on non-bankruptcy law matters

---

4. The Trustee asserts in its Complaint that the proceedings are core also under 28 U.S.C. § 157(b)(2)(B) and (O) but the allegations contained therein are more appropriately characterized as counterclaims to LaSalle's Claim. They are therefore statutorily core under 28 U.S.C. § 157(b)(2)(C). The allegations also seeks a determination as to the validity and extent of LaSalle's liens and are therefore core under 28 U.S.C. § 157(b)(2)(K). In its Answer to the Complaint, LaSalle admits the matter is core under § 157(b)(2)(C), (K), and (O). (Answer ¶ 3) Subsection O applies to "other proceedings affecting liquidation of the assets of the estate or the adjustment."

statutorily designated as "core proceedings" may under some circumstances be called into question. The counterclaims brought by the Trustee in this case seek determination of the scope of LaSalle's liens under state law, and so that issue was pertinent here.

■ On November 14, 2011, the parties here were required to submit supplemental briefs on a bankruptcy judge's authority to enter final judgment in this Adversary proceeding in light of the Supreme Court holding in *Stern v. Marshall*, ‒‒ U.S. ‒‒, 131 S.Ct. 2594, 2620, 180 L.Ed.2d 475 (2011). The Order called on the parties to state whether or not each consented to entry of final judgment by a bankruptcy judge on each Count in the event *Stern* is deemed to prohibit final judgment in absence of consent. In filings by the parties each did consent to entry of final judgment by a bankruptcy judge, and so a dispositive ruling may be entered on the Trustee's Motion for Partial Summary Judgment. (11 A 01983 Dkt. Nos. 26 & 27)

## DISCUSSION

### Partial Summary Judgment Standard

Doctors Hospital requests an order limiting the LaSalle Trust's Claim to the extent that such Claim purports to reach certain assets of the Debtor. Doctors Hospital does not seek full adjudication of the Claim; rather it requests a determination that would adjudicate the extent of liens supporting that Clam. In doing so, Doctors Hospital seeks relief characterized as "Partial Summary Judgment" under Fed.R.Civ.P. 56 (made applicable in bankruptcy under Fed. R. Bankr.P. 7056). Under that provision:

A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Our Circuit has held that "Rule 56(d) of the civil rules is explicit in allowing the judge to grant summary judgment on less than the plaintiff's whole claim." *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, 313 F.3d 385, 391 (7th Cir.2002).

As discussed further below, LaSalle has challenged the propriety of deciding a dispute over contract interpretation on summary judgment. Nevertheless, some issues identified by the Trustee are appropriate for summary judgment. Whether LaSalle's liens on the settlement proceeds are subject to equitable subordination, whether LaSalle waived its lien rights over the proceeds, and whether *res judicata* precludes LaSalle from asserting its liens on settlement proceeds can all be determined by a summary judgment procedure. However, two of these issues, waiver and equitable subordination, can only be reached if it is first established that the contracts in issue unambiguously show that LaSalle's liens extend to the settlement proceeds. Thus, possible application of *res judicata* to LaSalle's Claim might be decided through summary judgment procedure. That issue should be determined before reaching other issues because if LaSalle's Claim was thereby precluded then other issues need not be addressed.

### Asserted Res Judicata

■ Doctors Hospital argues that the doctrine of *res judicata* or claim preclusion bars LaSalle from asserting a claim against the settlement proceeds. This claim, they contend, could and should have been asserted when LaSalle contested

movant's settlements with Desnick and Webb. "Claim preclusion under federal law has three ingredients: a final decision in the first suit; a dispute arising from the same transaction (identified by its 'operative facts') and the same litigants (directly or through privity of interest)." *U.S. ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 851 (7th Cir.2009) (citations omitted).

The first and third elements of claim preclusion are undisputed. Doctors Hospital and LaSalle were both parties to the contested settlement agreements. *See In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 421 (7th Cir.2007). The Bankruptcy Court's order approving settlement was a final judgment. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 S.Ct. 2195, 2205, 174 L.Ed.2d 99 (2009).

■■■ However, there was not an identity between the claims raised here and those in the settlement approval proceedings. Seventh Circuit authority holds that "two claims are one for purposes of res judicata if they are based on the same, or nearly the same, factual allegations." *Herrmann v. Cencom Cable Associates, Inc.*, 999 F.2d 223, 226 (7th Cir.1993). Here, the factual allegations giving rise to each claim are quite different. In the contested settlement proceedings, LaSalle claimed that the settlement should not be approved because it was not in the best interests of the estate. The factual allegations behind LaSalle's contention were those surrounding the proposition that the estate would extract more money from Desnick by litigation than by settlement. In the present dispute, LaSalle argues that the initial loan agreement and subsequent cash collateral orders give them a blanket lien on all of Doctors Hospital's personal property, including post-petition settlement proceeds. The operative facts giving rise to this claim are the contents of these documents. Because a single group of operative facts was not in play in both the contested settlement proceedings and disputes then presented, there was no identity of claims, and LaSalle is not precluded from claiming that their lien extends to the proceeds of settlement agreements.

This history should be distinguished from the concept of a "necessary counter claim", wherein failure to assert some cause related to the claim may well cause a party to lose rights to that claim. *See Warshawsky & Co. v. Arcata National Corp.*, 552 F.2d 1257, 1261 (7th Cir.1977). There was no such earlier claim to which the present issue should have been raised as a necessary counterclaim.

### A. Interpretation of an Unambiguous Contract Can be Decided on Summary Judgment

■■■ LaSalle has questioned the propriety of deciding the meaning of contract language in a Motion for Summary Judgment. It argues that the parties disagree as to the meaning and interpretation of certain loan documents. In particular, the parties disagree over whether LaSalle's liens and security interests extend to a group of assets relating to the *operations of the hospital*, or whether the liens attach merely to the bricks and mortar of the hospital facility. Under Seventh Circuit precedent, matters of contract interpretation may not be susceptible to summary judgment where contract terms are ambiguous. In *Old Republic Insurance Co. v. Federal Crop Insurance Corp.*, 947 F.2d 269, 274 (7th Cir.1991), the Opinion stated: "When a contract is the subject of a summary judgment motion, the appropriateness of summary judgment will turn on the clarity of the contract terms under scrutiny. Only if a term is completely unambiguous will a court be able to conclusively establish its meaning as a matter of law." *Accord Banque Paribas v. Hamilton In-*

*dus. Int'l Inc.,* 767 F.2d 380, 383 (7th Cir.1985) ("the decision ... must turn on the simple principle that a contract dispute cannot be resolved on summary judgment when the meaning of the contract depends on the interpretation of ambiguous documents and can be illuminated by oral testimony."); *Fitzsimmons v. Best,* 528 F.2d 692, 694 (7th Cir.1976). The necessary inquiry, then, is whether the contract terms involved here are ambiguous.

■■ A contract is not ambiguous because the parties offer competing interpretations of its terms. *Curia v. Nelson,* 587 F.3d 824, 829 (7th Cir.2009). Whether a contract is ambiguous is a question of law. *Id.* Contract terms are ambiguous if a reasonably intelligent person viewing the terms objectively could interpret the language in more than one way. *Topps Co., Inc. v. Cadbury Stani S.A.I.C.,* 526 F.3d 63, 68 (2d Cir.2008). The Trustee argues that the contract terms in dispute unambiguously support his Motion as to the scope of LaSalle's liens over certain assets of the Debtor. LaSalle argues those terms are ambiguous. Both agree that if the dispositive terms are ambiguous, then summary judgment cannot be entered here based on contract interpretation.

1. *Documents to be Reviewed in Deciding the Scope of LaSalle's Lien*

■■ The parties do not agree on what contract or contracts must be interpreted. In his Rule 7056–1 Statement, the Trustee asserts that "[t]he scope and extent of the relevant liens asserted by [LaSalle] in the assets of Doctors Hospital are found in an Operator Security and Pledge Agreement dated August 28, 1997 between Nomura and Doctors Hospital." (Security Agreement ¶ 6) In its Response to that Statement, LaSalle disputes that the scope and extent of the relevant liens are found "exclusively" in the Pledge. (¶ 6) Rather, La-

Salle argues that all documents executed by Doctors Hospital in association with the $50 million loan from Nomura should be analyzed to determine the scope of its liens. Those documents are: (1) the Guaranty and Suretyship Agreement (the "Guaranty"); (2) the Operator Security and Pledge Agreement; and (3) the Assignment of Management Agreement and Agreements Affecting Real Estate (the "Assignment") (collectively, the "Loan Documents"). (Mem. Response, at 4 n. 4)

The Trustee relies in part on one Opinion by the undersigned judge for the proposition that where, as here, "there is an otherwise valid security agreement, extraneous documents and indications of the parties' intention those documents are irrelevant to a determination of the extent of the security interest created by a formal security agreement." *In re Sarah Michaels,* 358 B.R. 366, 379 (Bankr.N.D.Ill. 2007). Subsequent authority supports that statement. One Seventh Circuit Opinion considered a secured creditor's argument that its security interest extended to certain tort claim settlements. The creditor relied on a U.C.C. financing statement filed in connection with the loan made to the debtor in that case. Language in that financing statement provided a broader scope of the creditor's lien than the security agreement executed when the loan was made. In declining to consider the financing statement to determine the scope of the creditor's lien, the Opinion stated "it is the security agreement, which in this case is the part of the loan contract that contains the grant to the lender of the security interest, defines that security interest and by defining limits it." *Helms v. Certified Packaging Corp.,* 551 F.3d 675, 680 (7th Cir.2008).

In the present case, the Security Agreement contains the "Grant of Security" to LaSalle. Consequently, LaSalle cannot

rely on documents outside of the Security Agreement in asserting the scope of a security interest in Debtor's property. Only that document should be examined to determine the scope of LaSalle's lien.

### 2. The Security Agreement Unambiguously Grants LaSalle a Lien on Settlement Proceeds

LaSalle has claimed a lien on the Desnick, Daiwa, and Webb settlement proceeds. Whether or not that Claim is viable depends on what the words say in Paragraph 2 of the Security Agreement that contains the "Grant of Security" to LaSalle. The parties offer sharply contrasting readings of the Grant, which reads in relevant part:

> 2. The Operator hereby grants, bargains, sells, releases, conveys, warrants, assigns, transfers, mortgages, pledges, sets over and confirms unto Lender, its successors and assigns, as security for Operator's interest in and to the following, and any property as to which a security may be created or perfected relating to the Facility, now existing or hereafter coming into existence . . .
>
> (a) *All Inventory,* fixtures *relating to the Facility,* Equipment, Permits, Licenses, *General Intangibles,* Instruments, Accounts, Account Collateral, Leases, Money investment properties relating to the Facility, rights to proceeds of letters of *credit relating to the Facility* and goods, now existing or hereafter arising or acquired (other than Permits and Licenses which by their terms or applicable law prohibit a collateral assignment thereof); . . .

> (c) *All other property relating to or necessary to operate the Facility;*
> . . . .

(LaSalle Ex. 4, at 9) (emphasis supplied)

This dispute centers partly on whether subsection (a) or subsection (c) or both of those subsections of Paragraph 2 of the Grant of Security apply to the present dispute. The Trustee focuses its argument on subsection (a); LaSalle relies on subsection (c). The Trustee categorizes the settlement proceeds as "General Intangibles" as defined in the Security Agreement. LaSalle argues that the proceeds are included among "[a]ll other property relating to or necessary to operate the Facility."

While Paragraph 2 contains the grant of collateral interest to LaSalle, Paragraph 1 of the Security Agreement defines some terms used in Paragraph 2. The language in Paragraph 2 of the Security Agreement is therefore further limited by the definitions assigned to those words. Important for this discussion, the term "Facility" "has the meaning set forth in the Recitals of this Security Agreement." Those Recitals provide that the "Facility" consists of the "improved real property described on *Exhibit A* attached hereto . . . together with all easements, rights of way and other property rights appurtenant thereto and all Equipment attached to, located at or otherwise used in connection with the foregoing . . . which . . . has a street address 5800 South Stony Island Avenue, Chicago, Illinois 60637–2099." Exhibit A contains the legal description of the Facility.[5]

---

**5.** The description reads:

Lots 1 through 10, both inclusive, in Walker and Daggett's Subdivision of that part lying East of Railroad of the Southeast 1/4 of the Northeast 1/4 (except the North 492–1/2 feet thereof), recorded August 5, 1875 in Book 10 page 12 as Document Number 42672, of Section 14, Township 38 North, Range 14 East of the Third Principal Meridian, together with all the vacated alley lying West of and adjoining said Lots 1 through 10 both inclusive, aforesaid, in Cook County, Illinois.

The term "General Intangibles" is defined in the Security Agreement to include:

> ... all of Operator's 'general intangibles,' as such term is defined in the UCC *relating to the Facility,* and, to the extent not included in such definition, all intangible personal property of Operator *with respect to the Facility* (other than Accounts, Rents, Instruments, Inventory, Money and Permits), including, without limitation, all Receivables, Financing Proceeds, things in action, settlements, judgments, contract rights, rights to performance (including, without limitation, rights under warranties) refunds of real estate taxes and assessments and other rights to payment of Money, copyrights, trademarks, trade names and patents now existing or hereafter in existence. (emphasis supplied)

The Trustee argues that terms of the Security Agreement limit LaSalle's lien to "General Intangibles" that are "relating to or necessary to operate the Facility." (Security Agreement ¶ 2(c)) The Trustee argues that to be part of the collateral, then, a general intangible as defined in the Uniform Commercial Code ("U.C.C.") must relate to "the Facility" or, if the intangible is not contained in the U.C.C. definition, the intangible must be "with respect to the Facility."

■ The Uniform Commercial Code, as interpreted by New York courts, governs the issues in this Motion.[6] The New York U.C.C. definition of intangibles found in § 9–106 includes "things in action" and so includes the Settled Claims. But, the Trustee argues that the language of the Security Agreement requires that the intangible also relate to the Facility. The Facility, as defined in Paragraph 1 of the Security Agreement, consists only of the formal legal description of the real property where Doctors Hospital conducted its business. The settlement proceeds do not relate to the Facility because they have nothing to do with the real property described in the definition of Facility.

LaSalle rejects the Trustee's reading of the Security Agreement. Instead, it argues that the Security Agreement granted a blanket lien on all of Debtor's personal property relating to the *operations* of the Facility and not just the bricks and mortar from which the Debtor operated. According to LaSalle, the language of the Security Agreement disproves the Trustee's construction of that Agreement on several grounds. First, LaSalle contends there is an unambiguous grant of liens in collateral necessary to operate the Facility in Paragraph 2(c) of the Security Agreement. Second, LaSalle argues that the Trustee's construction of the word "Facility" renders meaningless the entire Security Agreement. Finally, LaSalle insists that other documents executed in connection with the Nomura loan illustrate that its liens extend beyond the bricks and mortar of the hospital Facility. For reasons already stated, LaSalle cannot rely on documents other than the Security Agreement in arguing

---

6. The Pledge Agreement contains an interesting inconsistency. Paragraph 12.15 of the Security Agreement stipulates that it and "obligations arising hereunder shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and performed in such State and any applicable law of the United States of America." In the "Definitions" section of the Security Agreement, however, the term "U.C.C." is defined as "the Uniform Commercial Code in effect in the jurisdiction in which the Facility is located." (LaSalle Ex. 4, at 8) As noted previously, the hospital Facility was located in Chicago, Illinois. Neither party addressed this inconsistency. Instead, both tacitly agreed that New York law governs this dispute as each relied on that law in arguing its position. Therefore, New York state court precedent will be applied here.

that its liens extend to the settlement proceeds.

One aspect of the controversy centers on the meaning of "Facility" and the extent to which the phrase "relating to the Facility" in subsection (c) of Paragraph 2 of the Security Agreement encompasses collateral above and beyond the physical land and building of the hospital. The Trustee contends that use of this term restricts LaSalle's lien to the brick and mortar of the hospital building and nothing else. The Security Agreement unambiguously defines "Facility" to mean the "improved real property" leased by Doctor's Hospital from HPCH, LLC. Yet, this does not end the inquiry as LaSalle was also granted a lien in "General Intangibles" "relating to the Facility."

As earlier quoted, "General Intangibles" covered by LaSalle's lien include such intangibles defined under the Uniform Commercial Code including "things in action," that is to what the law recognizes as choses in action. LaSalle contends that this provides a lien on the settlement proceeds in question. In light of the unambiguous definition of "Facility," LaSalle's lien is limited to "things in action" relating to the real property of the hospital. However, this does not mean that LaSalle's lien is limited only to the brick and mortar of the Facility. That reading by the Trustee is contradicted by the Security Agreement's use of the phrase "relating to the Facility" in defining "Inventory." The Security Agreement uses the identical language in defining "General Intangibles" and "Inventory." In each case, the definition has two parts. First, the types of collateral (*i.e.,* Inventory or General Intangibles) include the definition of the collateral as provided in the U.C.C. Then, to the extent not included in the U.C.C. definition, additional specified subsets of the collateral are listed and incorporated into the definition.

The Security Agreement defines "General Intangibles" and "Inventory" as follows:

> *"General Intangibles"* means all of Operator's "general intangibles," as such term is defined in the UCC relating to the Facility, and, to the extent not included in such definition, all intangible personal property of Operator with respect to the Facility (other than Accounts, Rents, Instruments, Inventory, Money and Permits), including, without limitation, all Receivables Financing Proceeds, things in action, settlements, judgments, contract rights, rights to performance (including, without limitation, rights under warranties) refunds of real estate taxes and assessments and other rights to payment of Money, copyrights, trademarks, trade names and patents now existing or hereafter in existence.

> *"Inventory"* means all of Operator's "inventory," as such term is defined in the UCC, relating to the Facility, and, to the extent not included in such definition, all goods now owned or hereafter acquired by Operator with respect to the Facility intended for sale or lease, or to be furnished under contracts of service by Operator for sale or use at or from the Facility, and all other such goods, wares, merchandise, and materials and supplies of every nature owned by Operator with respect to the Facility and all other such goods returned to or repossessed by Operator with respect to the Facility.

(LaSalle Ex. 4, "Operator Pledge and Security Agreement," at 4, 5)

As defined in Article 9 of the Uniform Commercial Code as adopted in New York, "Inventory" "means goods, other than farm products, which: (A) are leased by a person as lessor; (B) are held by a person for sale or lease or to be furnished under a contract of service; (C) are furnished by a person under a contract of service; or (D)

consist of raw materials, work in process, or materials used or consumed in a business." N.Y. U.C.C. Law § 9–526. Inventory refers to transient goods relating to the operation of a business. The Trustee's interpretation of the Security Agreement would render meaningless the grant of the hospital's inventory as collateral. Real property and the physical structure on it do not generate inventory.

The Trustee argues that "inventory" does need not be generated by the real estate to meet that term's definition in the Security Agreement. In particular, the Security Agreement definition of Inventory includes "all other goods, wares, merchandise, and materials and supplies of every nature owned by Operator with respect to the Facility." According to the Trustee, this language encompasses a variety of materials, tools, and supplies necessary for the everyday maintenance and upkeep of the real estate. In addition, Doctors Hospital had an obligation under its lease with HPCH, LLC to maintain and make needed repairs to the leased property. (Reply App. 18, at 2) The Trustee contends that it is not unusual for a lender to take a lien that extends to assets that a Debtor does not own or that do not exist.

The Trustee's arguments are not convincing. The broad language in the Security Agreement does not limit LaSalle's lien to the paint, nails, and other hardware necessary to maintain a hospital facility when that language secures a $50 million loan to a hospital operator. As such, each grant of security in property "relating to the Facility" can also refer to the hospital operations within that facility and thus to settlement of rights with respect thereto.

Furthermore, the Security Agreement otherwise grants liens to LaSalle in collateral necessary to operate the Facility. As described previously, Paragraph 2(c) grants to LaSalle a lien in and to "all other

property relating to or necessary to operate the Facility." (at 9) The Trustee distinguishes this language by arguing that this is not the same as the phrase "necessary to operate the hospital." As "Facility" is clearly defined as the real property, LaSalle's lien is limited to all other property relating to or necessary to operate the real property on which the hospital was located. A physical structure does not by itself "operate"—a functioning hospital does operate within and as part of the hospital building. Paragraph 2(c) of the Security Agreement establishes that the grant of security to LaSalle was intended to be broad, supporting LaSalle's argument as to the scope of its liens. The Security Agreement must thereby be read to give LaSalle a security interest in "things in action," that is claims relating to the real estate and in all other property necessary to operate Doctors Hospital.

### B. New York Law Prohibits a Lien on Part of the Settlement Proceeds

■■■■ The Settled Claims are a subset of "things in action" and thus are asserted by LaSalle to be covered by its lien on the hospital's General Intangibles. New York law determines the nature and extent of security interests. *Butner v. U.S.*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). A New York statute in effect at the time the Security Agreement was executed prohibited the taking of a security interest in tort claims. N.Y. U.C.C. Law § 9–104(k) (Consol. 1998) (excluding application of Article 9 "to a transfer in whole or in part of any claim arising out of tort.") The Trustee argues that allegations that were settled against defendants Desnick, Webb, and Daiwa (fraudulent transfers, breach of fiduciary duty, and wrongful payment of dividends) were tort claims under New York law. *See, e.g., Gulf Coast Dev. Grp., LLC v.*

*Lebror,* 2003 WL 22871914, at *4 (S.D.N.Y.2003) (fraudulent conveyances); *Sergeants Benevolent Ass'n Annuity Fund v. Renck,* 19 A.D.3d 107, 796 N.Y.S.2d 77 (App.Div.2005) (breach of fiduciary duty); N.Y. Jurisprudence 2d § 713 (wrongful payment of dividends). The Trustee contends that LaSalle's lien could not take a security interest in settlement of those claims against those defendants.

LaSalle counters that proceeds of the Settled Claims are its collateral because it was granted a lien upon "[a]ll present and future contract rights ... not otherwise included as collateral under [subsection (a) of the Security Agreement]...." (LaSalle Ex. 4 ¶ 2(b)) It relies on an unpublished Opinion holding that an ambiguity exists as to whether or how the parties in that case intended collateral to attach where multiple collateral descriptions could give rise to a lien. *See L & J Anaheim Assoc. v. Kawasaki Leasing Int'l, Inc.,* 1991 WL 527014 (C.D.Ca., Aug. 2, 1991).

In *Kawasaki Leasing,* the obligor argued that the secured lender's claim to a lien on litigation proceeds could be found, if at all, only in a provision within the loan documents that granted a lien on general intangibles. *Id.* at *2. The secured lender acknowledged that provision was relevant but argued that other sections of the loan agreement also applied because general intangibles were not the only asset category under which litigation proceeds could fall. *Id.* at *3. After reviewing the documents in question, the Opinion stated:

> ... this Court rejects [obligor's] argument that the Loan Agreements are un-

ambiguous and clearly exclude the [litigation] proceeds from the collateral. First, this Court disagrees with [obligor's] contention that the Disputed Paragraphs are the only sections of the Loan Agreements relevant to the issue at hand. Although it is true that the [litigation] is a "thing in action" and the Disputed Paragraphs deal with the category of assets, [the litigation] proceeds can also fall under other asset categories which are dealt with in other sections of the Loan Agreements. For example, even [obligor] agrees that the part of the [litigation] proceeds which are attributable to the breach of contract cause of action can be deemed as "damages arising out of or for breach or default in respect of any ... contract or account" and therefore, subject to a security interest [as a contract claim].

*Id.* at *6–7. LaSalle asserts here that, as in *Kawasaki Leasing,* the proceeds of some portion of the Settled Claims fall into multiple categories of collateral to which LaSalle's liens attach. Indeed, $3 million of the $6 million of the Desnick settlement proceeds arose in contract as a result of loans made by Doctors Hospital to Desnick. (LaSalle Ex. 13 ¶ 6(a)) ("Doctors Hospital and the Settling Parties agree to the following allocation of the proceeds realized from the Settlement Agreement as follows: (a) repayment in part, of the principal amount of the loans from Doctors Hospital to Desnick....") Another $380,000 arise from contractual indemnity. (*Id.* at ¶ 7(c)) ("Desnick agrees to indemnify Doctors Hospital ... to the extent of the amount of the Medicare/Medicaid Claim....")[7]

---

[7] The Desnick Settlement Agreement (LaSalle Ex. 13) does not clearly specify how much the Trustee recovered based upon an agreement by Desnick to indemnify Doctors Hospital as part of the Settlement Agreement. However, in his Memorandum in Support of the Motion for Partial Summary Judgment as to Certain Assets, the Trustee indicates he recovered $380,000 based upon the indemnity. (Mem. Supp., at 5. n. 2) That figure was not disputed here.

The Trustee argues that those portions of the settlement proceeds are not secured by LaSalle's lien, contending that they do not arise out of LaSalle's contract rights. He insists that those proceeds are properly categorized as coming from general intangibles consisting of "things in action." New York precedent holds that a thing in action is defined as a "right to receive or recover a debt, demand, or damages on a cause of action *ex-contractu* or for a tort or omission of a duty." *Sheahan v. Rodriguez*, 194 Misc.2d 179, 753 N.Y.S.2d 664, 667 (N.Y.Sur.2002). Furthermore, the Trustee argues, under the U.C.C., "contract rights" are subsets of the collateral type "Accounts" or "General Intangibles." The loans made to Desnick assertedly do not fit within the definition of "Accounts" because they did not represent "any right to payment for goods sold or services rendered...." N.Y. U.C.C. Law § 9–106 (1978). If the contractual rights do not involve the sale or lease of goods or the rendering of services then such rights must be categorized as a subset of general intangibles. *In re Gordon Car & Truck Rental, Inc.*, 75 B.R. 466, 470 (Bankr. N.D.N.Y.1987). All this does not help the Trustee. Although it may be fair to categorize Desnick settlement proceeds as proceeds of "General Intangibles" this does not change their character as non-tort contract claims. Accordingly, those parts of the Desnick settlement proceeds that arise in contract and not in tort and may be subject to LaSalle's lien.

This conclusion also disposes of the Trustee's argument that LaSalle cannot have a lien on preferences because the proceeds of preference actions are held by the post-petition debtor in its own right. The Trustee cites *Frank v. Michigan*, 263 B.R. 538, 540 (E.D.Mich.2000) and *In re Tek–Aids, Inc.*, 145 B.R. 253, 256 (Bankr. N.D.Ill.1992) (Ginsberg, J.) for the proposition that a secured creditor cannot assert an interest in preference actions. Those Opinions held against secured creditors seeking to extend pre-petition security interests to property recovered on behalf of the debtors' bankruptcy estates. The Opinion in *Frank* reasoned that upon filing a bankruptcy petition any recoveries under the Bankruptcy Code's avoiding powers belong to the estate and not the debtor *qua* debtor. *Frank*, 263 B.R. at 540. *Tek–Aids* further reasoned that "[a]llowing a prepetition blanket security interest to reach preference actions would be tantamount to giving a creditor additional collateral it would not have had if the debtor had not filed a bankruptcy petition or had a petition filed against it. Such a windfall contradicts any notion of fair and equal treatment among creditors." *In re Tek–Aids Indus.*, 145 B.R. at 256. That Opinion further reasoned that a pre-petition security interest could not attach to a cause of action that did not exist before the filing of a bankruptcy petition because if the debtor had never filed for bankruptcy then no preference actions could have been brought by anyone.

Those cases are distinguishable, however, as in each case the recovery derived from provisions of the Bankruptcy Code. *See NBD Park Ridge Bank v. SRJ Enters., Inc.*, 150 B.R. 933 (Bankr.N.D.Ill. 1993) (Barliant, J.) In this case, LaSalle relies on settlement as to non-bankruptcy contract rights held by the Debtor pre-petition. Unlike in *In re Tek–Aids, Indus.*, Doctors Hospital could have brought the actions to enforce contract claims against Desnick and related entities. The Desnick Settlement Agreement did not contain language showing that allocation of the $3 million loan amount or the $380,000 contractual indemnity amount were recoverable through the recovery powers in bankruptcy.

LaSalle suggests that reasoning in the cases cited by the Trustee can be applied to the Webb and Daiwa settlements because, it argues, the Trustee "did not provide sufficient grounds on which it can be determined that either the Webb settlement or the Daiwa settlement sound exclusively in tort as a matter of law." (Response, at 13 n. 8) However, a reading of those agreements shows no indication that settlements were made on account of contract claims against Webb or Daiwa. The Webb Settlement agreement refers only to claims that could have been brought (but were not) against Webb based on alleged payments he received from the Debtor while it was insolvent—fraudulent transfers. (Movant's Ex. 11 ¶ 8(a)-(e)) That agreement also refers to alleged wrongful receipt of dividends. As described above, both to these claims are tort claims. The Daiwa Settlement agreement refers to claims made in the 2002 Adversary Complaint against Daiwa. (Ex. 1 to Movant Ex. 9, at 1) Those claims were: fraudulent transfers to Daiwa (Count XII of the 2002 Adversary); preferences to Daiwa (Count XIII of the 2002 Adversary); and unauthorized post-petition transfers under 11 U.S.C. § 549 (Count XIV). (Movant's Ex. 14 ¶¶ 194–201; 202–210; 211–215) None of these claims are or can be asserted to be based in contract.

Furthermore, LaSalle did not offer evidence or point to any particular provision in the documents available to refute the Trustee's assertion that the Settled Claims against Webb and Daiwa were based in tort. The "party seeking summary judgment always bears the initial responsibility of informing a court of the basis for his motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which he believes demonstrate the absence of a genuine issue of material fact." *Zamora v.*

*Jacobs,* 448 B.R. 453, 462 (Bankr.N.D.Ill. 2011) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party meets his initial burden of production, the opposing party may not rest on the mere allegations or denials in its pleadings; rather, its response must provide specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Outlaw v. Newkirk,* 259 F.3d 833, 837 (7th Cir.2001). LaSalle has not done so here so judgment will be entered in favor of the Trustee as to the Webb and Daiwa Settlements.

 LaSalle also argues that the New York U.C.C. explicitly allows security interests in commercial tort claims. In their briefs, the parties disagree as to what version of the U.C.C. applies here. The Trustee relies on the former version of Article 9 in effect in New York at the time the Security Agreement was executed. Revised Article 9 took effect on July 1, 2001 in New York. N.Y. U.C.C. Law § 9–701. Revised Article 9 applies to pre-revision transactions in many cases. § 9–702. Whether Revised Article 9 applies could be critical. Section 9–109, and specifically Comment 15 thereto, elaborates on the distinction between commercial tort claims and payment intangibles arising under settlements of commercial tort claims. That Comment provides ". . . once a claim arising in tort has been settled and reduced to a contractual obligation to pay, the right to payment becomes a payment intangible and ceases to be a claim arising in tort." § 9–109 Cmt. 15. As each of the Settled Claims was pursuant to a settlement agreement, LaSalle's liens may attach to the settlement proceeds by virtue

of a lien on payment intangibles (as a subset of General Intangibles).

For his part, the Trustee argues that even if Revised Article 9 applies LaSalle's lien did not attach to the settlement proceeds because its description failed. Section 9–108(e) of the New York U.C.C. provides that "[a] description only by type of collateral defined in this chapter is an insufficient description of: (1) a commercial tort claim." As a result, LaSalle cannot rely on the pledge of "General Intangibles" in the Security Agreement to support a lien on commercial tort claims.

The Trustee's Motion will therefore be granted with respect to settlement proceeds that arise in tort.

### C. Asserted Lien by Virtue of the Third Cash Collateral Order

LaSalle claims a lien on preference and fraudulent transfer recoveries by virtue of the Third Cash Collateral Order. This argument is inconsistent with that Order. The Third Cash Collateral Order (1) Authorizing Interim Use of Cash Collateral, (2) Providing Adequate Protection and (3) Rescheduling Final Hearing granted LaSalle trust a "valid, binding, enforceable lien ... with the same priority and extent as existed prepetition, in all presently owned or hereafter acquired property and assets of the Debtor." However, that language did not stand alone. The Order also explicitly excluded "the proceeds of any recoveries under Sections 506(c), 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code."

LaSalle therefore has no claim to the proceeds of such recoveries by virtue of the Third Cash Collateral Order. Movant's Motion for Partial Summary Judgment will therefore be granted with respect to these lien claims; LaSalle's lien does not extend to the settlement proceeds

insofar as they are preference or fraudulent transfer recoveries.

### D. Lien on Proceeds of Parking Lot Sale

Finally, LaSalle Claim is asserted to extend to proceeds of a sale of a parking lot adjacent to Doctors Hospital as the proceeds of the sale were paid to the Chapter 11 Trustee as part of the Desnick Settlement. The lot was owned by Leger Acquisition Corp. ("Leger"), which was in turn wholly owned by James Desnick.

LaSalle had no pre-petition security interest in the parking lot. The Security Agreement gave LaSalle a security interest in property necessary to operate the hospital facility. It did not extend to real property outside the parcel as narrowly defined in the Loan Agreement.

LaSalle also had no post-petition security interest in the parking lot stemming from the Third Cash Collateral Order. As discussed above, the Order granted LaSalle a valid lien "in all presently owned or hereafter acquired property and assets of the Debtor." Neither party, however, suggests that the parking lot was ever owned by the debtor. At the date of sale, March 18, 2003, the parking lot was owned by Leger, not the debtor. If the parking lot was fraudulently conveyed to Leger, as the debtor's Adversary Complaint alleges, the explicit language of the Third Order excludes proceeds of any such recoveries.

### E. Asserted Subordination of LaSalle's Lien

The Chapter 11 Trustee argues that LaSalle cannot assert a lien on collateral created as a result of its own wrongdoing as a matter of common law and under 11 U.S.C. § 501(c)(1). LaSalle's alleged wrongful conduct consists of receiving alleged fraudulent transfers pursuant to agreements made by its predecessor

(Nomura) in the form of rental payments that exceeded fair market value. Because LaSalle participated in such fraudulent activity, the Trustee argues, it should not be able to recover proceeds from settlements resolving fraudulent transfer claims made against other defendants in the 2002 Adversary.

The Trustee cites precedent holding that under the common law a creditor cannot acquire a lien "founded upon [its] own illegal or fraudulent act, or breach of duty." (Mem. Supp., at 9–10) (citing *e.g.*, *Randel v. Brown*, 43 U.S. 406, 424, 2 How. 406, 11 L.Ed. 318 (1844) (citing state court decisions); *Kittrell v. State Emp. Credit Union*, 115 B.R. 873, 882–83 (Bankr. M.D.N.C.1990)). However, the Trustee has cited and offered no evidence that LaSalle's liens were *created* as the *result* of its own specified wrongdoing.

 Similarly, under § 501(c)(1) of the Bankruptcy Code, a bankruptcy judge may subordinate all or part of a creditor's claim to that of another claim if it is determined that the creditor is guilty of misconduct that injures other creditors or that confers unfair advantage on that creditor. (Mem. Supp., at 10) (citing *In re Matter of Envirodyne Indus., Inc.*, 79 F.3d 579 (7th Cir.1996); *In re Kreisler*, 546 F.3d 863, 866 (7th Cir.2008)). Equitable subordination under § 501(c)(1) requires three conditions: (1) the creditor engaged in some type of inequitable conduct, (2) the misconduct resulted in injury to other creditors or gave the creditor some unfair advantage on the creditor, and (3) that subordination must not be inconsistent with other provisions of the Bankruptcy Code. *Kreisler*, 546 F.3d at 866. This issue is not yet ripe for adjudication. No determination has been made in the remanded 2002 Adversary as to whether or not the rental payments in question were fraudulent transfers. A described previously, a Seventh

Circuit Opinion vacated in part an earlier decision that rent payments made to LaSalle by the Debtor were fraudulent transfers. *Paloian v. LaSalle Bank, N.A. (In re Doctors Hosp. of Hyde Park, Inc.)*, 619 F.3d 688, 695 (7th Cir.2010). No evidence was submitted as part of summary judgment materials that established wrongdoing. Therefore, there can be no ruling on the equitable subordination issue because there is no showing yet of wrongdoing that could trigger the equitable subordination doctrine.

### F. Asserted Waiver

 The Trustee contends that LaSalle has waived its right to make a claim to proceeds of settlement claims by not asserting that claim at earlier stages of the bankruptcy proceeding. Liens may be waived only where a party "intentionally relinquishes a known right either expressly or by conduct indicating that strict compliance with the condition is not required." *LaSalle Nat. Bank v. Metropolitan Life Ins. Co.*, 18 F.3d 1371, 1375 (7th Cir.1994), citing *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Insurance Company*, 962 F.2d 628, 633 (7th Cir.1992). This is a high bar, and it requires an express waiver that was not demonstrated here.

 Doctors Hospital did not cite any legal authority relied on to support its argument that LaSalle waived its claim to settlement proceeds. It argues only the several opportunities that LaSalle had to assert such a claim but did not do so (when Wildman Harrold was retained on a contingency basis; when LaSalle filed an Answer to movant's Adversary Complaint; when claims were settled over LaSalle's objections; and when LaSalle appealed the order approving the settlements). Failure to assert a claim on the settlement proceeds on any of these occasions did not by

itself show intentional waiver of the present claim.

## CONCLUSION

For the foregoing reasons, counsel for the Chapter 11 Trustee will be ordered to prepare a proposed draft order and judgments as follows:

1. Entering final judgment on the Trustee's Motion for Partial Summary Judgment finally disposing of and declaring as to Counterclaim Count No. II that LaSalle's Lien does not extend to the Daiwa, Desnick, or Webb Settlement proceeds to the extent they consist of recovery on tort claims against those defendants but does extend to $3,380,000 plus any interest accrued on money received in settlement of contract claims;

2. Entering final judgment in favor of the Trustee on his Motion for Partial Summary Judgment finally disposing of and declaring as to Counterclaim Counts No. XIII that LaSalle's lien does not extend to proceeds of the real estate sale by Leger Acquisition Corp.;

3. Entering final judgment in favor of the Trustee on his Motion for Partial Summary Judgment finally disposing of and declaring as to Counterclaim Counts XI and XII that LaSalle has no lien or interest in any proceeds realized or to be realized from preference or fraudulent conveyance actions brought by the Trustee pursuant to 11 U.S.C. §§ 544, 547, 548, and 550; Trustee's defenses to the LaSalle lien based on *res judicata* and waiver are without merit.

5. Otherwise denying the Motion for Partial Summary Judgment.